UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEUTSCHE LUFTHANSA AG,

                Plaintiff ,

       - against -

THE BOEING COMPANY,

              Defendant.

Civ. No.:  06 CV 7667


## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR  A PRELIMINARY INJUNCTION


McDermott Will & Emery LLP
340 Madison Avenue
New York, New York  10017
(212) 547-5400

*Attorneys for Plaintiff*
*Deutsche Lufthansa AG*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL BACKGROUND ................................................................................ 3

    A.    The Parties ......................................................................................... 3

    B.    The Value of the Product .................................................................. 4

    C.    Boeing and Lufthansa Partnered to Develop the CBB Technology ............ 5

    D.    The Parties Execute a Service Agreement ....................................... 6

    E.    Lufthansa Invested Millions In Installing
        and Marketing Connexion by Boeing ............................................. 7

    F.    Boeing Allowed Lufthansa and Other Carriers to Invest  Millions
        While it Secretly Considered Exiting the Market ........................... 9

    G.    Boeing Announced its Decision to Terminate
        the CBB Service By Year-End and Accelerate
        Its Termination Plan on Virtually No Notice ................................. 9

    H.    Lufthansa Unsuccessfully Attempts to Mitigate its Harm .......... 11

ARGUMENT ...................................................................................................... 12

I.    LUFTHANSA IS LIKELY TO SUCCEED ON THE
    MERITS OF ITS  CLAIMS FOR BREACH OF
    CONTRACT AND SPECIFIC PERFORMANCE .................................. 13

    (a)    Lufthansa Is Entitled to Specific
         Performance Under the Service Agreement ................................. 13

    (b)    The Provisions of the Agreement that Cap and/or
         Limit Damages Render A Damage Remedy Inadequate ............ 15

    (c)    Lufthansa Is Also Entitled to Specific Performance
         of the Service Agreement Because There Is No
         Adequate Remedy At Law For Other Reasons As Well ............ 16

II.    LUFTHANSA WILL SUFFER IRREPARABLE
    HARM IF AN INJUNCTION IS NOT GRANTED ............................... 20

III.    A BALANCE OF THE HARDSHIPS TIPS
    DECIDEDLY IN FAVOR OF LUFTHANSA ...................................... 22

CONCLUSION ................................................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*Aim Int'l v. Valucine*, 02 Civ. 1363 (PKL), 2002 U.S. Dist. LEXIS 10373
(S.D.N.Y. Jun. 11, 2002). ..................................................................................17, 22

*Alcatel v. Loral,* 154 F. Supp. 2d 570 (S.D.N.Y. 2001)......................................................22

*American Express Co. v. Vibra Approved Lab. Corp.,* No. 87 Civ. 8840 (CSH),
1989 U.S. Dist. LEXIS 4377, at * 29 (S.D.N.Y. Apr. 19, 1989)………...................19

*Balaber-Strauss v. Markowitz*, 192 B.R. 623 (Bankr. S.D.N.Y. 1996). ............................16

*Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245 (2d Cir. 1999).......................21

*Computer Assoc. Int'l, Inc. v. Bryan*, 784 F. Supp. 982 (E.D.N.Y. 1992) ......................20

*Gerard v. Almouli*, No. 83 Civ. 0995 (CBM), 1984 U.S. Dist. LEXIS 19999
(S.D.N.Y. Jan. 30, 1984)...................................................................................18

*Guinness-Harp Corp. v. Jos. Schlitz Brewing Co.*, 613 F.2d 468 (2d Cir. 1980)..............15

*Hull, Inc. v. Waterbury Petroleum Products, Inc.*, 588 F.2d 24 (2d Cir. 1978),
*cert. denied*, 440 U.S. 960..............................................................................21

*Jacobson & Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438 (2d Cir. 1977). ..............17, 18

*Laurus Master Fund Ltd. v. Versacom Int'l, Inc.,* No. 02 Civ. 5340 (LTS)(MMD),
2003 U.S. Dist. LEXIS 8480, at * 11 (S.D.N.Y. May 22, 2003).................................14

*N. Am. Consol., Inc. v. Kopka*, 644 F. Supp. 191 (D. Mass. 1986). ................................14

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430 (2d Cir. 1993). ...........17

*Norcom Elec. Corp. v. CIM USA Inc.*, 104 F. Supp. 2d 198 (S.D.N.Y. 2000).................17

*Polymer Tech. Corp., v. Mimran*, 37 F.3d 74 (2d Cir. 1994). ...........................................13

*Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904 (2d Cir. 1990). ........................17, 21

*Ross-Simmons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996)..........18, 22

*Supermarket Serv., Inc. v. Hartz Mountain Corp.*, 382 F. Supp. 1248 (S.D.N.Y.
1974). ..............................................................................................................19

*Tom Doherty Assoc., Inc. v. Saban Entm't*, 60 F.3d 27 (2d Cir. 1995). ...........................18

# TABLE OF AUTHORITIES

**Page(s)**

*Tradewell, Inc. v. Atari Corp.*, 95 Civ. 1935 (LMM), 1995 U.S. Dist. LEXIS 3601 (S.D.N.Y. 1995). ......................................................................................18

*Trans Union Credit Info. Co. v. Assoc. Credit Serv., Inc.,* 805 F.2d 188, 192-93 (6th Cir. 1986)...........................................................................................17

*Travelers Ins. Co. v. 633 Third Assoc.*, 973 F.2d 82 (2d Cir. 1992)....................14, 15, 16

*Vestron, Inc., v. Nat'l Geographic Soc'y,* 750 F. Supp. 586 (S.D.N.Y. 1990). ...........19, 20

*Warnervision Entm't, Inc. v. Empire of Carolina, Inc.*, 101 F.3d 259 (2d Cir. 1996). ............................................................................................................20

*Wright v. Giuliani*, 230 F.3d 543 (2d Cir. 2000). ........................................................13, 23

## STATE CASES

*Handelsman v. New York Assoc.*, 31 A.D.2d 906, 298 N.Y.S.2d 280 (1st Dep't 1969). ............................................................................................................14

*IBP, Inc. v. Tyson Foods, Inc.*, 789 A.2d 14 (Del. Ch. 2001)...........................................13

*Rubinstein v. Rubinstein*, 23 N.Y.2d 293, 296 N.Y.S.2d 354 (N.Y. 1968). ....................14

## FEDERAL STATUTES

FED. R. CIV. P. 65. ..................................................................................................................1

NYK 1058361-2.076869.0011

Deutsche Lufthansa AG ("Lufthansa"), by and through its attorneys, McDermott Will & Emery LLP, hereby submits this Memorandum of Law in support of its application, pursuant to Fed. R. Civ. P. 65(b), for a temporary restraining order and motion for a preliminary injunction against The Boeing Company ("Boeing").

## PRELIMINARY STATEMENT

Lufthansa seeks a temporary restraining order and preliminary injunction to stop Boeing from: (a) wrongfully terminating an agreement with Lufthansa pursuant to which Boeing has, since 2003, provided Lufthansa's business travelers and other customers with high-speed internet access during their flights; and (b) proceeding with Boeing's publicly announced plan to dismantle the "Connexion by Boeing" business unit (the unit responsible for this product).

Last Friday, Lufthansa filed a complaint asking this Court to order Boeing to specifically perform its contract obligations on the grounds that (i) Boeing is, by its own admission, the only provider of high-speed internet access services; (ii) the services are unique; and accordingly (iii) Lufthansa cannot be adequately compensated in money damages if Boeing is permitted to proceed with its termination plan.  Rather than seek to have Boeing perform for the entire remaining six years left on the contract, Lufthansa's Complaint seeks a decree of specific performance for a period of time sufficient to allow an alternative provider to enter the market.  Lufthansa has already identified several possible companies, but Lufthansa estimates that it would take them three years to enter the market (or one year, if Boeing agrees to cooperate by transferring technology, equipment and satellite licenses to them) and assume Boeing's obligations.

If the Court does not issue the requested temporary restraining order/preliminary injunction then, by the time a trial is had and Lufthansa prevails on the merits of its

specific performance claim, the Court will be <u>unable</u> to grant specific performance. Boeing's Connexion division will have been dismantled and there will be no business left that this Court could order Boeing to perform.

Importantly, the interim injunctive relief Lufthansa seeks will merely require Boeing to adhere to the original wrongful termination schedule (should termination ultimately be allowed by this Court) that Boeing publicly announced four weeks ago. On August 17th of this year, Boeing announced that it would dismantle "Connexion by Boeing" on December 31, 2006. At that time, Boeing represented that "service would remain operational until year-end." Boeing recently, however, abruptly decided to <u>accelerate</u> its own wrongful termination date, in clear violation of its representations that service will remain "operational until year-end." On September 15, Boeing advised Lufthansa that: Boeing had in fact cut off internet service to one region of the world on <u>August 31st</u>; was terminating service to another region on the very next day, <u>September 16</u>; and would terminate service to yet another region on <u>September 30</u> as well, and terminate some of the internet product's functionality in those areas that still had service.

Significantly, more than <u>90,000</u> Lufthansa customers – who already have flight reservations – are expected to use the product for flights leaving between October and December, 2006. If interim injunctive relief is not granted, these tens of thousands of customers will find that – despite Lufthansa's advertisements and marketing statements as to the availability of high-speed internet access on Lufthansa flights – the product will <u>not</u> be available to them and/or that its availability and functionality have been greatly curtailed. Lufthansa <u>will</u> lose the goodwill of these customers, who rightfully will be angered that Lufthansa is denying them the services it had advertised. Moreover, the loss

or diminishment of this product will further injure Lufthansa by denying it a key competitive advantage that Lufthansa gained, by being the first, and now one of the few, airlines to provide broadband internet access.

Lufthansa believes that the action could be tried on the merits by December 31, 2006 – *i.e.*, the date on which Boeing originally announced (only four weeks ago) that it intended to terminate the contracted-for service. This expedited date on which to try this action is eminently reasonable because there is no dispute here about liability – Boeing has not, and cannot, assert that it has not materially breached the contract. Here, the only issue is the appropriate relief. By granting the requested interim injunctive relief, the Court will simply be holding Boeing to its <u>originally</u> announced termination date: December 31, 2006. If the Court ultimately issues a decree of specific performance (given the unique character of the product) following an expedited trial, specific performance will remain a meaningful remedy. Moreover, Lufthansa will have been spared the wrath of 90,000 angry customers and the attendant loss of their goodwill and future sales – all of which is unquantifiable and immeasurable.

## FACTUAL BACKGROUND

### A.     The Parties

Lufthansa is a public company organized under the laws of Germany with its principal place of business in Germany. Lufthansa is one of the world's premier international airlines, offering the most up-to-date in-flight services to its customers. Boeing is a Delaware corporation with its principal place of business in Chicago, Illinois. Boeing is a leading aerospace company that manufactures, among other things, commercial and military airplanes, and advanced information and communication systems. Boeing is the <u>only</u> company that provides airline travelers with high-speed internet access

during long-haul flights.  "Connexion by Boeing" is the Boeing division responsible for the product at issue.

**B.**     **The Value of the Product**

Boeing and Lufthansa worked together to develop the product.  Boeing described the product as an in-flight "internet service" that provides broadband internet access to travelers on long-haul flights ("the CBB Service").  Customers using the service use a standard laptop with a wireless connection to access the world-wide web from the airplane during their flight.  This access allows travelers to utilize corporate intranets, send and receive real-time emails, and use the internet during the flight.  The CBB Service also provides a live feed to several international news channels.  (Declaration of Bernhardt Seiter dated September 22, 2006 ("Seiter Dec."), at ¶ 14).

This unique service has proven so valuable that, upon information and belief, it is currently used on United States governmental VIP aircraft, even on Air Force One. Additionally, eleven other international airline carriers, business jets, and ships have the service – all of whom will be adversely affected by Boeing's decision to close down this business. (*Id.* at ¶ 15).

The CBB Service filled an empty niche in the marketplace.  (*Id.* at ¶ 16). According to an American Express survey, loss of productivity and falling behind at the office are the top complaints among business travelers.  (*Id.*, Ex. A).  According to a survey sponsored by Intel in 2003, 71% of business travelers believe that the wireless web will enable them to gain a competitive advantage.  In the same survey, one-third of respondents stated that they have suffered significant adverse consequences as a result of being "off-line" while on the road.  (*Id.*, Ex. B).

The CBB Service is the only product on the market that is able to provide broadband internet connectivity on long-haul flights.   Because of the CBB Service, business travelers no longer need to be cut off from their work during long-haul flights. Not surprisingly, a number of Lufthansa's corporate customers have signed corporate subscriber agreements with Boeing to access the service.  (*Id.* at ¶ 17).

Lufthansa competes with other air-carriers primarily on the basis of superior service and the use of cutting edge technology, as opposed to on the basis of pricing. Through such services and technological innovations, which enhance the in-flight experience, Lufthansa is able to attract premium business travelers from carriers that may be less expensive (and therefore, otherwise more attractive).   The innovative and unique Connexion by Boeing in-flight internet service has been a key component of Lufthansa's marketing strategy over the last several years.  (*Id.* at ¶ 13).

## C.      Boeing and Lufthansa Partnered to Develop the CBB Technology

In mid-2000, Boeing approached Lufthansa and certain other leading airline carriers regarding the possibility of creating technology to develop broadband internet access for aircraft.  (*Id.* at ¶ 19).  Soon after the 2000 meeting, Lufthansa began working with Boeing to develop and implement the CBB Technology.   Lufthansa ultimately agreed to act as the "launch customer" for the new product, with all of the attendant risks.  (*Id.* at ¶ 21).  From early 2001 until late 2004, Lufthansa tasked eleven of its employees with the sole responsibility of working with Boeing to develop and implement the CBB technology, at an initial cost to Lufthansa of approximately $4 million.  (*Id.* at ¶ 22).

It took two years before Boeing and Lufthansa were able to conduct the first trials of the CBB System (which occurred from January 15 to April 18, 2003, on Lufthansa's Frankfurt/Washington route).   Those trials were a resounding success.  Lufthansa spent

another approximately $5 million preparing for and conducting the trial flights.  (*Id.* at ¶ 23).

**D.**     **The Parties Execute a Service Agreement**

Soon after the test flights were completed, Lufthansa and Boeing negotiated an agreement pursuant to which the parties agreed to provide CBB Service on Lufthansa long-haul aircraft.  (*Id.* at ¶ 26).  Importantly, Boeing stated that the new product represented a long-term investment by both parties and that it would likely incur losses in the near term. Boeing insisted that Lufthansa agree to a long-term contract, lasting 10 or 12 years, so that Boeing could ultimately recoup its research and development costs.  Lufthansa agreed to Boeing's request.  (*Id.* at ¶ 27).

On or about May 21, 2003, Boeing and Lufthansa entered into the Service Agreement outlining the responsibilities of both parties for the implementation and maintenance of the CBB Service.  (*Id.* at ¶ 28).  Under the terms of the Service Agreement, the "service period," *i.e.* the period when Boeing was to provide its CBB Service to Lufthansa, began on May 17, 2004, and ended on June 30, 2012.  (*Id.,* Ex. D, ¶ 2.4.1.) Lufthansa had the right to extend the service period for an additional three years (until 2015) at its sole discretion.  (*Id.*, Ex. D at ¶ 2.4.2.).

Importantly, the Service Agreement does not allow Boeing, or Lufthansa for that matter, to terminate the agreement prior to June 30, 2012.  Both parties assumed the risk that they would not be able to terminate the contract in the event that the venture did not prove profitable for one or the other party.  (*Id.* at ¶ 31).  Importantly, no provision of the Service Agreement waives a party's right to seek specific performance if damages are inadequate to make the other party whole.

To be sure, the Service Agreement does provide that (a) a party "may," terminate it upon the material breach by the other party, and (b) if the non-breaching party does choose to terminate, its remedies are purportedly limited to certain narrow remedies (such as paying for the cost of equipment de-installation).  (*Id.,* Ex. D, ¶ 10.3.2.)  However, that provision states that Lufthansa "may," not "must," terminate.   This provision is not implicated here since Lufthansa is seeking to enforce and continue the contract with Boeing, not terminate it.  (*Id.* at ¶ 35).

A separate provision of the agreement purports to cap the parties' damages at $100,000 per cause of action, and $1 million overall on all causes of action (with certain exceptions).  (*Id.*, Ex. D, at ¶ 10.12.6.)   Another provision purports to eliminate either parties' ability to get consequential damages.  (*Id.*, Ex. D at ¶ 10.12.5).   The Service Agreement nowhere states, however, that the purported limitation on consequential damages and the cap on damages described above are the sole and exclusive remedies upon breach.  (*Id.* at ¶ 36).

**E.      Lufthansa Invested Millions In Installing
and Marketing Connexion by Boeing**

On May 17, 2004, CBB was launched on a Lufthansa flight from Munich to Los Angeles.  (*Id.* at ¶ 37).  Relying on Boeing's long term commitment, Lufthansa agreed to invest in the implementation and installation of the CBB System.  From that first flight until today, Lufthansa has spent over $80 million U.S. on marketing and installing the CBB System.  In total, Lufthansa has spent more than *$120 million* U.S. on total direct costs in connection with the CBB Service.  (*Id.* at ¶ 41).

In particular, Lufthansa spent over $46 million U.S. marketing the wireless-web services available on its flights from 2004 to 2006.  Lufthansa's campaigns included

everything from advertisements in national and international magazines and newspapers, billboard campaigns (in airports, on trains and in subways), and radio placements. In 2004, Lufthansa launched marketing campaigns in the United States, England, Italy, France, Russia, Japan, the Netherlands, Asia, Australia, Korea, China, India, Finland and Germany. In 2005, Lufthansa expanded its advertising campaigns to New Zealand, Singapore, Kuwait, Poland, Belgium and Malaysia. (*Id.* at ¶ 39). All of Lufthansa's marketing materials were co-branded with Boeing, meaning that Lufthansa not only advertised that it had the wireless web on its planes, but that it offered Connexion <u>by Boeing</u>. (*Id.* at ¶ 40).

As the launch customer and Boeing's development partner, <u>Lufthansa pioneered the market for Boeing</u>. Indeed, other airline carriers, particularly within the so-called "Star Alliance," met with Lufthansa to discuss the CBB Service, and received free consulting services before deciding to contract with Boeing. (*Id.* at ¶ 42). Lufthansa was also the first airline in the world to receive permission from governments to install and operate a wireless network onboard, which was crucial to the CBB Service and its rollout to other airline customers. (*Id.* at ¶ 43).

To date Boeing has entered into agreements with 11 airlines, including Austrian Airlines, Singapore Airlines, ANA, Korean, Asiana, China Airlines, Eithad, SAS, JAL, and El Al Israel Airlines, to provide CBB Service on long-haul flights. In addition, Boeing now has, upon information and belief, agreements with the United States and the Saudi governments, as well as at least one shipping company. Thus, Boeing's termination will not just impact Lufthansa, but will impact these companies (and their customers) as well. (*Id.* at ¶ 44)

**F.    Boeing Allowed Lufthansa and Other Carriers to Invest**
**Millions While it Secretly Considered Exiting the Market**

During the winter of 2005-2006, Lufthansa expended substantial monies in rolling-out the CBB Service.  Indeed, more than two-thirds of the Lufthansa planes that now have the CBB Service were equipped during this period.  (*Id.* at ¶ 47).  In March, Lufthansa announced that CBB Service would be available on flights to Boston, Chicago, Detroit, New York, Portland and Washington DC.  (*Id.* at ¶ 47; Ex. H).

Lufthansa continued to expand its commitment to the CBB Service into the summer of 2006.  Specifically, Lufthansa engineered technology to install the CBB equipment in the new Airbus A380 aircraft.  Lufthansa also caused Airbus to commence installation of the CBB equipment on the seven new Airbus A340 planes on order – all with the active support of Boeing.  This will be the first forward fit installation for this Boeing system on an Airbus aircraft.  Since Airbus and Boeing are competitors, it required significant efforts to persuade Airbus to approve these forward fit installations.  Lufthansa was the sole carrier that was able to secure the necessary support from Airbus.  (*Id.* at ¶ 48)

Although aware that Lufthansa (and other airlines) were expending considerable money, irreversibly altering their fleets to accommodate the CBB System, and increasing the number of routes on which the service was available, Boeing was, at the time and unbeknownst to Lufthansa, secretly considering closing down the business.  (*Id.* at ¶ 49)

**G.    Boeing Announced its Decision to Terminate the CBB Service By**
**Year-End and Accelerate Its Termination Plan on Virtually No Notice**

On August 17, 2005, Boeing advised Lufthansa, its largest and longest-term CBB customer, that Boeing decided to exit the business and shut down the service at the end of the year.  (*Id.* at ¶ 50).  Importantly, in its letter advising Lufthansa of the impending year-end termination, Boeing had represented that "*Connexion Service will operate through the*

*end of the year*." (*Id.* at ¶ 51). Thus, Boeing represented that, its breach notwithstanding, Boeing would continue service at least until December 31. (*Id.*, Ex. I).

Soon thereafter, however, Boeing presented Lufthansa with a "Phase Out Plan" that indicated that Boeing had decided to accelerate its previously announced termination date. Despite having just promised to continue service "through the end of the year," the Phase Out Plan stated, among other things, that Boeing would begin to terminate certain services as early as September 30; disable Lufthansa's ability to monitor the CBB System on September 30: (*i.e.,* a quality control function); discontinue billing on October 2; and discontinue CBB Service altogether on December 31. (*Id.* ¶ 53; Ex. J).

Matters became even worse when Boeing, shortly thereafter, changed its mind again. Specifically, during the evening of September 15, Boeing forwarded Lufthansa a map entitled "Connexion by Boeing Service Transition Plan," which indicated that Boeing: had already terminated service over areas of the Middle-East and East Africa on August 31; was terminating service over portions of the central Atlantic the next day, (*i.e.,* on September 16th); and was terminating service over the remainder of the central Atlantic on September 30. A few days later, Boeing advised that it will largely dismantle Lufthansa's customers' access to in-flight help on October 30. (*Id.* at 55; Ex. K).

Approximately 90,000 Lufthansa customers who already have flight reservations (and who made those reservations at a time when Lufthansa was marketing and advertising the availability of the service), will be adversely affected by the additional service outages that Boeing stated it will effectuate beginning September 30th.

According to a survey published by Boeing in 2006, of the Lufthansa customers who have used the product, 94% stated that they planned on using the service again on

10

future flights.  Fully 66% stated that the availability of CBB Service <u>had</u> <u>an</u> <u>impact</u> <u>on</u> <u>their</u> <u>choice</u> of airline.  Moreover, <u>a whopping 84% stated that it would impact their choice of</u> <u>airline in the future.</u>  For a carrier like Lufthansa, which markets itself as the industry leader in technological advances in aviation, the value in offering this type of advanced, cutting-edge technology is immeasurable.  (*Id.*, Ex. M).

**H.**    **Lufthansa Unsuccessfully Attempts to Mitigate its Harm**

As a result of the import of the CBB System, Lufthansa chose not to terminate the agreement, even in the face of Boeing's bad faith and willful misconduct.  Instead, Lufthansa immediately undertook to mitigate the effect that Boeing's abrupt actions would have on its business.  (*Id.* at ¶ 57).  First, Lufthansa entered into discussions with Boeing in the hopes of persuading Boeing to either stay in the market or exit on a reasonable timetable that would allow an alternative provider to step into Boeing's shoes – allowing for a seamless and uninterrupted transition of service.  Second, Lufthansa began looking for that alternative provider.  (*Id.* at ¶ 58).

Despite Lufthansa's best efforts, Boeing has rebuffed Lufthansa's request that it delay exiting the market.  Quite the contrary, and as detailed above, Boeing began phasing out aspects of its service, without notice, in the middle of what Lufthansa believed were good faith negotiations.  Boeing has also stressed that it reserves the right to change its "Service Phase Out Plan" at any time – meaning that Boeing may discontinue other aspects of the CBB Service with no notice whatsoever.  (*Id.* at ¶ 59).

Lufthansa has, however, been able to identify at least three different companies that could be interested in taking over the Connexion service.  Lufthansa's efforts to prevent a loss of its goodwill, however, would be futile if Boeing continues on its present schedule to exit the market by year's end.  (*Id.* ¶ 60).

11

Assuming Boeing gave an alternative would be service provider its full cooperation (*i.e.,* transfer of equipment, transfer of licenses, etc.), it would take approximately 12 months to transition the CBB Service to a new provider. If Boeing is unwilling to cooperate, however, it would likely take three years for a new provider to design the technology, roll-out and install the equipment in Lufthansa's airplanes, and obtain the necessary satellite and other licenses. (*Id.* at ¶ 61).

However, Lufthansa cannot move forward with any effort to protect its goodwill and other interests if Boeing persists in its current plan to cut-off service by various aspects of the CBB System before December 31. Boeing will have irreparably harmed Lufthansa even if allowed to terminate the Service Agreement on the original schedule of December 31. By unilaterally accelerating even that schedule, however, Boeing has eviscerated any hope Lufthansa has of protecting its goodwill and salvaging a program in which it has invested tens of millions of Euros – a product that has been a cornerstone of Lufthansa's marketing strategy for the last several years. (*Id.* at ¶ 63).

## ARGUMENT

This Court should grant Lufthansa's motion for a preliminary injunction and temporary restraining order in order to maintain the *status quo* by preventing Boeing, at least temporarily, from (1) exiting the business of providing in flight internet access, (2) and dismantling its Connexion by Boeing business until, at the very least, its original termination date of December 31, 2006, by which time a trial on the merits can be had and Lufthansa's ultimate right to relief determined.

It is well settled that, under New York law, a preliminary injunction may issue upon a demonstration of irreparable harm and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground

for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *See e.g., Wright v. Giuliani*, 230 F.3d 543, 547 (2d Cir. 2000); *Polymer Tech. Corp. v. Mimran*, 37 F.3d 74, 77-78 (2d Cir. 1994).

Here, these elements are all present.

## I.

## LUFTHANSA IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS FOR BREACH OF CONTRACT AND SPECIFIC PERFORMANCE

There is no question that Lufthansa is likely to succeed on the merits of its breach of contract claim. Boeing materially breached the Service Agreement by abruptly and unilaterally announcing that it will terminate the CBB Service. Boeing cannot claim that the parties' agreement allows it to terminate the contract – quite the contrary, the Service Agreement requires that the parties perform through June 2012, and through 2015 if Lufthansa elects to extend it. *See* Seiter Dec., Ex. D at ¶ 2.4.2. Boeing cannot defend its actions in terminating the agreement.

The only issue that needs to be determined is the relief to which Lufthansa is entitled. Here, specific performance is the appropriate and, in fact, essential relief. At trial, this Court may order specific performance if Lufthansa shows that it is entitled to such relief by a mere preponderance of the evidence. Indeed, New York "favor[s] a standard [for specific performance] that makes it easier, rather than more difficult, to hold a party to its specific promise." *IBP, Inc. v. Tyson Foods, Inc.*, 789 A.2d 14, 53 (Del. Ch. 2001).

### (a)     Lufthansa Is Entitled to Specific Performance Under the Service Agreement.

Under New York law, a party is free to seek specific performance unless there is explicit language in the contract itself that either (1) specifically precludes the remedy of

specific performance; or (2) provides that a specified damage remedy is the sole and exclusive remedy. *Rubinstein v. Rubinstein*, 23 N.Y.2d 293, 297-298, 296 N.Y.S.2d 354, 358 (N.Y. 1968); *see, e.g., Travelers Ins. Co. v. 633 Third Assoc.*, 973 F.2d 82, 85 (2d Cir. 1992)(rev'd on other grounds)("by waiving its right to pursue remedies at law . . . plaintiff did not thereby waive whatever rights it may have under New York law to sue in equity . . ."); *Laurus Master Fund Ltd. v. Versacom Int'l, Inc.*, No. 02 Civ. 5340 (LTS)(MMD), 2003 U.S. Dist. LEXIS 8480, at *11 (S.D.N.Y. 2003) (". . . the presence of a liquidated damages clause does not bar specific performance unless there is language which provides that recourse to liquidated damages shall be the sole remedy"); *N. Am. Consol., Inc. v. Kopka*, 644 F. Supp. 191, 193-194 (D. Mass. 1986) (intent to relinquish right to specific performance must be clearly expressed). This holds true in particular where, as here, the defendant repudiated the contract and willfully fails to perform. *Handelsman v. New York Assoc.*, 31 A.D.2d 906, 906, 298 N.Y.S.2d 280, 280-81 (1st Dep't 1969) (exculpatory clause did not have the effect of precluding the plaintiff from the right to the relief of specific performance if corporate defendant's failure to perform was due to its repudiation of the contract).

The New York Court of Appeals' decision in *Rubinstein* is instructive. In that case, the parties' contract contained a liquidated damages provision. The defendant argued that the provision reflected an intent to preclude any other remedy, including specific performance. The New York Court of Appeals disagreed, explaining that because (1) the contract did not expressly bar specific performance; and (2) the liquidated damages clause did not specify that it was to be the <u>sole remedy</u>, specific performance remained available and appropriate. *See Rubinstein*, 23 N.Y.2d at 297-98.

Here, the Service Agreement contains clauses purporting to limit liability and consequential damages. However, neither these, nor any other provision of the Service Agreement, state that Lufthansa cannot seek specific performance if the enumerated damages are inadequate to make Lufthansa whole. Likewise, these provisions do not state that they are the "sole and exclusive" remedy.[1] Thus, specific performance remains as an available remedy, particularly in the face of Boeing's repudiation of the Service Agreement and willful failure to perform its obligations.

**(b)     The Provisions of the Agreement that Cap and/or**
**         Limit Damages Render A Damage Remedy Inadequate.**

Here, the contractual cap on monetary damages and limitation on consequential damages <u>in fact establishes</u> a right to specific performance because Lufthansa cannot be made whole unless Boeing continues to perform under the contract. New York courts have consistently held that specific performance is appropriate where legal remedies are "unavailable" or "inadequate". *See e.g., Travelers*, 973 F.2d at 86; *Guinness-Harp Corp. v. Jos. Schlitz Brewing Co.*, 613 F.2d 468, 473 (2d Cir. 1980) (injunctive relief appropriate where loss of product is "likely to disrupt (plaintiff's) business and injure its reputation, consequences for which would be difficult if not impossible to determine . . . to prevent disruption to a company's business and reputation [with its customers]"). Where, as here, damages are, by definition, not adequate to make a plaintiff whole, specific performance is appropriate. *See Travelers,* 973 F.2d at 85 (exculpation clause served as evidence that plaintiff did not have an adequate remedy at law).

---

[1] While a separate provision of the contract purports to provide a "sole and exclusive" remedy if a party chooses to terminate the contract in the face of a material breach by the other, the contract does not require the non-breaching party to terminate. Indeed, the relevant provision expressly says that the non-breaching party "may," not "must" terminate. Here, the provision is not at issue here since Lufthansa is seeking to enforce and continue the contract, not terminate it.

The Second Circuit's decision in *Travelers* is instructive.   There, the defendant argued that plaintiff was precluded from seeking specific performance because of a contractual exculpation clause that foreclosed "any action or proceeding wherein damages or any money judgment shall be sought..." *Travelers*, 973 F.2d at 85.   The Second Circuit disagreed, holding that plaintiff was entitled to bring a cause of action for specific performance precisely <u>because</u> damages were not available "by virtue of the exculpation cause." *Id*. at 86.   Instead of limiting the plaintiff's remedies, therefore, the Second Circuit found that the contractual limitation on damages showed that legal remedies were "unavailable or inadequate." *Id*. at 86; *see also, Balaber-Strauss v. Markowitz,* 192 B.R. 623, 632 (Bankr. S.D.N.Y. 1996) (holding specific performance appropriate where plaintiff had no adequate remedy due to a cap on damages).

Putting aside the $120 million Lufthansa has spent developing, marketing, and installing the CBB System, the $1 million cap provided for in the agreement cannot possibly compensate Lufthansa for the loss of reputation, goodwill and competitive advantage it derives from the CBB System.   As in *Travelers*, "by virtue" of this clause alone, Lufthansa is without an adequate remedy at law, and is entitled to specific performance.

**(c)    Lufthansa is Also Entitled to Specific Performance
of the Service Agreement Because There Is No
<u>Adequate Remedy At Law for Other Reasons As Well.</u>**

Even if the Service Agreement did not purport to eliminate Lufthansa's ability to be made whole, here monetary damages would still be inadequate to compensate Lufthansa for the loss of the unique product.   Boeing's breach of the Service Agreement will cause Lufthansa to suffer harm to its goodwill, reputation, future sales and loss of a competitive edge it currently enjoys – all of which constitutes immeasurable, unquantifiable and, thus,

irreparable harm. *Jacobson & Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438, 444-445 (2d Cir. 1977) (loss of goodwill, and resulting loss of customers or potential customers results in "immeasurable harm;" loss of competitive advantage is "neither calculable nor compensable in dollars and cents"); *see Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 436 (2d. Cir. 1993) ("doubts concerning the adequacy of money damages should be resolved in favor of granting specific performance"); *Norcom Elec. Corp. v. Ciro USA Inc.*, 104 F. Supp. 2d 198, 210 (S.D.N.Y. 2000) (specific performance granted where loss of product would result in loss of customers, placing plaintiff at creation of a competitive disadvantage).

First, as Boeing admits on its own website, Connexion by Boeing is currently the only provider of in-flight real time internet service.  It is well-established that the loss of the ability to offer a unique product is immeasurable and unquantifiable. *See, e.g., Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907-08 (2d Cir. 1990) ("termination the delivery of a unique product to a distributor whose customers expect and rely on the distributor for a continuous supply of that product almost inevitably creates irreparable damage to the goodwill of the distributor"); *Norcom Elec. Corp. v. Cim USA Inc.,* 104 F. Supp.2d 198, 210 (S.D.N.Y. 2000) (accordingly, specific performance was granted to require continued provision of a unique product); *Trans Union Credit Info. Co. v. Assoc. Credit Serv., Inc.*, 805 F.2d 188, 192-93 (6th Cir. 1986); (specific performance granted because product was unique); *Aim Int'l Trading, L.L.C. v. Valucine S.p.A,* 02 Civ. 1363 (PKL), 2002 U.S. Dist. Lexis 10373, at *17 (S.D.N.Y. June 11, 2002) (product is "unique" where there is "no viable alternative").

Second, Boeing's unique and innovative product gives Lufthansa a competitive advantage in that customers will choose Lufthansa over other carriers (despite lower prices) because Lufthansa, unlike many of its competitors, provides its customers with high-speed internet access.   This loss of competitive advantage simply cannot be quantified.  *See, e.g., Jacobson*, 548 F.2d at 444-45 (loss of competitive advantage "neither calculable nor compensable in dollars and cents").  *See also Tom Doherty Assoc., Inc. v. Saban Entm't,* 60 F.3d 27, 33 (2d Cir. 1995) ("[w]here the loss of a product will cause . . . indeterminate losses in other business, the availability of money damages may be a hollow promise . . .").

Third, Lufthansa has millions of customers who have existing flight reservations for flights departing after Boeing's announced termination date:   December 31, 2006. Based on historical experience, <u>hundreds of thousands</u> of those customers will actually use Boeing's high-speed internet service.   Indeed, they made their reservations at a time when Lufthansa was marketing and advertising the availability of the service.   The goodwill of these customers will be lost if they do not find the high-speed internet access on their flights, <u>as Lufthansa advertised when they purchased their tickets</u>.   Again, this loss is immeasurable and unquantifiable.  *See, e.g., Ross-Simmons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) (relief granted where plaintiff had already distributed millions of catalogs and threat existed that absent injunction, customers may place orders that plaintiff would be unable to fill, thereby causing irreparable harm to reputation); *Tradewell, Inc. v. Atari Corp.*, 95 Civ. 1935 (LMM), 1995 U.S. Dist. Lexis 3601, at *2 (S.D.N.Y. Mar. 23, 1995) (specific performance granted where inability to deliver goods purchased by customer would result in damage to corporation's goodwill); *Gerard v.*

*Almouli*, No. 83 Civ. 1995 (CBM), 1984 U.S. Dist. Lexis 1999, at * 9-11 (S.D.N.Y. 1984) (injunctive relief granted in part on basis of irreparable injury to plaintiff's reputation and goodwill); *Supermarket Serv., Inc. v. Hartz Mountain Corp.*, 382 F. Supp. 1248, 1256 (S.D.N.Y. 1974) (inability to offer a particular brand would seriously threaten a loss of customers and harm to business reputation and goodwill).

Fourth, those customers who experience coverage outages on their flights and/or diminished functionality due to Boeing's phased-in termination will rightfully conclude the product is unreliable and/or undesirable.   In either case, the product's image will be irreparably tarnished.  As a result, even if Lufthansa were later able to find an alternative provider to enter the market, consumer confidence in the product will have been crushed. Damages caused by harm to a product's image is immeasurable and incalculable. *American Express Co. v. Vibra Approved Lab. Corp.*, No. 87 Civ. 8840 (CSH), 1989 U.S. Dist. LEXIS 4377, at * 29 (S.D.N.Y. Apr. 19, 1989) ("American Express has a legitimate concern that its own products' reputation may be tarnished by defendants' conduct; and that damage, impossible to quantify and hence irreparable, will result.").

Fifth, the CBB Service was just gaining momentum at the time that Boeing decided to pull the plug.  As discussed above, Lufthansa installed the requisite equipment in 2/3 of the equipped planes only last winter.  It was not until late Winter 2006 that the CBB Service was available on a number of routes to the United States.  Just this summer, Lufthansa installed the CBB System on more aircraft, including the much publicized new Airbus airplanes.  These damages are incalculable because it is impossible to project future profits. *See e.g. Vestron, Inc. v. Nat'l Geographic Soc'y*, 750 F. Supp. 586, 591 (S.D.N.Y. 1990).   Further, if CBB Service is shut-down, the momentum caused by customers'

increasing recognition of the value of in-flight internet access cannot be regained even if an alternative provider were able to enter the market. *See id.* (holding that "once the momentum of a [product] is disrupted, subsequent sales are adversely affected to an indeterminate extent.").

Sixth, Boeing's abrupt termination of the CBB Service will irreparably harm Lufthansa's caché as an innovator in the industry. As stated above, Lufthansa's success can be attributed largely to its reputation as a provider of the most advanced, cutting-edge technology and in-flight services. The loss of that caché is immeasurable. *See e.g., Computer Assoc. Int'l, Inc. v. Bryan,* 784 F. Supp. 982, 986-987 (E.D.N.Y. 1992) ("the potential loss of an industry leader's present market and loss of the advantage of being the pioneer in the field and the market leader, may constitute irreparable harm.").

## II.

### LUFTHANSA WILL SUFFER IRREPARABLE HARM IF AN INJUNCTION IS NOT GRANTED

Lufthansa brings this motion for temporary and preliminary injunctive relief in order to preserve the *status quo* until trial can be had on the merits of Lufthansa's claims. A "basic principle of preliminary injunction law" is "the preservation of the court's power to render a meaningful decision after trial on the merits." *Warnervision Entm't, Inc. v. Empire of Carolina, Inc.,* 101 F.3d 259, 261-262 (2d Cir. 1996). Absent an injunction here, by the time of a trial on the merits of Lufthansa's claim, the Court will have lost the ability to grant a decree of specific performance.

Boeing has already begun to terminate certain key components of the CBB Service, including coverage to Lufthansa's South American flights and significantly curtailing customer service. By December 31, 2006, according to its own public announcement,

Boeing will have completely discontinued and dismantled its CBB Service and the business unit responsible for that service, "Connexion by Boeing." If this is permitted, there will be no business for this Court to order to specifically perform, rendering any future order for specific performance meaningless, and litigation futile. *See Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 250 (2d Cir. 1999) (finding irreparable harm where "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action, the parties cannot be returned to the positions they previously occupied").

In addition to the necessity to preserve a final remedy, interim injunctive relief is necessary to prevent Lufthansa from suffering irreparable harm in a myriad of other respects.

Between now and December 31, a whopping 90,000 of Lufthansa's customers, who bought their tickets when Lufthansa was advertising the CBB Service, will be adversely affected by the service outages that Boeing has stated it will further effectuate beginning September 30. If Lufthansa is not able to offer these customers the CBB Service as promised (and as promised by Boeing when it stated that service would continue until December 31), the goodwill of those 90,000 customers will be lost, and Lufthansa's reputation irreparably tarnished. Lufthansa does not have a viable alternative to the CBB Product, and thus cannot evade the harm to its goodwill and reputation absent injunctive relief. *See, e.g., Reuters,* 903 F.2d at 907 (2d. Cir. 1990) (terminating delivery a unique product almost inevitably causes irreparable harm); *Hull, Inc. v. Waterbury Petroleum Products, Inc.*, 588 F.2d 24, 28-29 (2d Cir. 1978), *cert. denied*, 440 U.S. 960 (1979) (preliminary injunction granted where plaintiff "is totally deprived of the opportunity to

sell certain merchandise and may incur injury to its goodwill and reputation"); *Aim Int'l v. Valucine*, U.S. LEXIS 10373, (S.D.N.Y. 2002) (irreparable harm found where there is no viable alternative); *Alcatel v. Loral*, 154 F. Supp.2d 570, 584 (S.D.N.Y. 2001).

Lufthansa spent over $50 million marketing the CBB System, in part, to lure these customers – an effort that will prove fruitless if Boeing continues to slash the service even prior to its announced December 31, 2006 termination date.

The *Ross-Simmons* case is instructive. *Ross-Simmons,* 102 F.3d at19. There, the defendant unilaterally terminated its agreement with plaintiff for the supply of crystal. The plaintiff had already distributed millions of catalogues holding itself out to be a Baccarat Crystal dealer. The Court was persuaded by the fact that, absent injunctive relieve, plaintiff's customers may have placed orders that plaintiff would never be able to fill. *Id.* Here, Lufthansa has <u>already</u> <u>sold</u> hundreds of thousands of tickets to customers who expect to receive this product during their flights -- and at least 90,000 of them will be affected between October 1 and December 31.

For these reasons, Lufthansa is entitled to a three month stand-still to give it the chance to be heard on the merits of its claim. This Court should, at the very least, hold Boeing to its original promise to continue service until December 31, 2006, so that Lufthansa does not suffer additional irreparable harm because of Boeing's ill advised wrongful acceleration of its own deadline.

## III.

## A BALANCE OF THE HARDSHIPS TIPS<br>DECIDEDLY IN FAVOR OF LUFTHANSA

Lufthansa need not show that the balance of hardships tips in its favor because, as discussed in section I *supra*, Lufthansa is likely to succeed on the merits of its claim for

breach of contract. *See, e.g., Wright*, 230 F.3d at 547.   However, the balance of hardships does, in fact, tip decidedly in favor of Lufthansa because the harm of enjoining Boeing pales in comparison to the harm Lufthansa will experience.   Absent injunctive relief, Lufthansa's success in prosecuting this action would be a pyrrhic victory because the Connexion by Boeing system and technology would have already been dismantled.   The Court will not realistically be able to grant specific performance once the services no longer exist.   Boeing, on the other hand, has no cause to complain because Lufthansa is merely asking this Court to hold Boeing to its statements as recently as four weeks ago that service will remain effective until December 31, 2006.

Further, Boeing knew that the CBB Service was a long-term investment that would not likely be profitable for a number of years.   Boeing, a sophisticated party and a monopolist, acknowledged that it would incur losses and accepted that risk, and yet chose to abruptly pull the plug after Lufthansa and other airlines had invested millions.   Any hardship Boeing may suffer was brought upon itself, and does not outweigh the irreparable harm that Lufthansa will suffer.

## **CONCLUSION**

There is more than sufficient evidence to find that Lufthansa likely will succeed on the merits of its breach of contract and specific performance claims. Accordingly, the Court should issue the proposed orders temporarily restraining Boeing from discontinuing the CBB Service.

Dated: New York, New York
            September 25, 2006

McDERMOTT WILL & EMERY LLP

By: _____
            John J. Calandra (JC-3411)
            Leila Pittaway (LP-2907)

            340 Madison Avenue
            New York, New York  101730-1922
            (212) 547-5400

            *Attorneys for Plaintiff*
            *Deutsche Lufthansa AG*

NYK 1057824-9.076869.0011